SAMUEL, Judge.
This case was previously before us on appeal from a judgment in which the trial court maintained exceptions of no cause of action and dismissed the suits of the Attorney General and so*me individuals and civic clubs which had intervened on his side. State ex reí Guste v. Audubon Park Commission, La.App., 320 So.2d 291. After our reversal of this judgment the case was tried on the merits and resulted in a judgment in favor of defendants, dismissing the suits of the Attorney General as well as other plaintiffs and the intervenors. From that judgment only the Attorney General has appealed.
In our previous opinion, we said the following concerning the Attorney General’s right to bring this suit:
“As will be seen hereafter defendants rely on Act 191 of 1914 and Act 492 of 1958 for their principal authority to proceed with the project and to support their exceptions of no cause of action to the various petitions filed against them. There is no question but that APC is an agency of the City and not of the state, State Civil Service Commission v. Audubon Park Commission, 99 So.2d 920 (La. App. 4th Cir. 1958), but Audubon Park is owned by the State and not by the City, City of New Orleans v. Board of Commissioners, 148 So.2d 782 (La.App. 4th Cir. 1962), and when the legislature by the passage of the two acts cited above saw fit to place the administration and management of its property, the park, in the City and APC it did so within the limitations and under the conditions specified in those acts. Since the Attorney General’s petition contains allegations that defendants have exceeded and are exceeding their own authority it follows that he does have the right under the constitutional provision cited to bring this action to enjoin the defendants from doing so.”
We held that the Attorney General’s alleged cause of action was that the new expansion project would “change the character and nature of a substantial portion of the park, and change the character and nature of the entire park.” We also held that he could amend his petition to allege that defendants had, in violation of LSA-R.S. 48:512, closed various roads in the park which were public, pursuant to LSA-R.S. 48:491, and that with such an amendment a cause of action would be stated on this issue.[1]
On these two issues the trial court found:
“(b) The Audubon Park Commission may close drives and roadways in the parks, as these roads were created as access routes to the various facilities and exhibits within the park and are maintained and supervised by the Audubon Park Commission under its Managerial Legislative Authority. At all events the City Council by Resolution R-75-143 provided:
‘(9) The traffic in the Park shall be re-routed from Natatorium Drive, Aquar-iu.m Drive and River Drive to other throughfares in the Park according to the Master Plan and Natatorium Drive, Aquarium Drive, and River Drive shall be closed.’
(c) The Audubon Park Commission and the City have not exceeded their authority as general agents in the care of the park. The authority of the Audubon Park Commission is expressly stated in Act 191 of 1914, to wit:
*987 ‘Section 2 . That the said Audubon Park Commission shall be, and it hereby is vested with the control and management of the Park in the City of New Orleans, known as the ‘Audubon Park’.’
‘Section 3 . That the duties of the said Audubon Park Commission shall be to take charge and supervision of the said park, and to preserve and improve it for public recreation and use as a place of public resort and pleasure, and such Commission shall have full charge of the control and management, repair, maintenance, development and improvement of the said park.’
The Act is a clear unambiguous expression of authority given by the legislature to the Audubon Park Commission in FULL to develop and improve the Park. Thus, the actions undertaken by the Audubon Park Commission in the Master Plan for improvement of Audubon Park is fully within the Commission’s express legislative authority.
(d) The Audubon Park Commission and the City have not undertaken to change the ‘nature and character’ of the Park . .”
On the issue of the closure of the roads within the park the evidence shows that these roads were never formally dedicated as public roads, so that plaintiffs’ case can stand only on the theory that the roads are public because they have been ‘kept up, maintained or worked for a period of three years by authority of [the] Parish Governing Authority”. R.S. 48:491.
These roads were constructed for the sole purpose of accommodating the movements of vehicles within the park itself. This is still the principal function of the roads even though one may traverse these roads in order to move between points outside the park. The record reflects that the city has provided maintenance for these roads on the basis of specific requests from the Commission. This has occurred on an average of three times per year, over a period of many years. Since the Commission did not have the necessary personnel or equipment to maintain the roads, the maintenance was provided almost exclusively by the City. We do not conclude that these roads became public within the contemplation of R.S. 48:491 under the particular circumstances of this case.
Except for some private donations, only the City of New Orleans had provided funds for Audubon Park until 1970, when the State began to contribute. Since then the City has provided the bulk of the park’s revenues. Thus, the road maintenance provided by the City was merely a supplement to this direct financial assistance and the cost to the public of such maintenance had to be less than if the Commission had undertaken it directly.
As we perceive the intent of R.S. 48:491, if a private road is used by the public and maintained by the parish governing authority over a period of three years it loses its private character and takes on a public character with the result that it cannot be closed unless there is a compliance with R.S. 48:512. Surely the Commission, which established these roads for the purpose of affording movement within the park has the right to change their location, notwithstanding the fact that the City, of which the Audubon Park Commission is an agency, has provided maintenance for the roads in lieu of cash payments with which the Commission might have provided such maintenance.
 We next turn our attention to the 'ssue that the zoo expansion project has changed, or will change, the character and nature °f the park.
As previously discussed, the authority of the Commission is to control and manage Audubon Park as a park. The Commission does not have authority to close the park and convert it into something other than a park. A park is not the same as a zoo, and *988 the Commission would surely abuse its authority if it attempted to enclose the entire park with a fence and convert it into a zoo exclusively.
In the instant ease, what has already been accomplished and what has been projected under the Master Plan is considerably less than a complete change in the park, but plaintiffs sought to prove at the trial that the changes would have such an impact on the park as a whole that they would go beyond the Commission’s statutory authority for the “control and management, repair, maintenance, development and improvement of the . . . park” under Act 191 of 1914.
Plaintiffs’ position is that the size of the zoo project and its effect on the middle section of Audubon Park are such that they are beyond the Commission’s authority in that the character and nature of the park the Commission was charged with administering are to be changed under the guise of administering the park. The trial judge concluded the changes were not of such a degree to change the nature and character of the park. Our task is to review that determination.
Audubon Park consists of three sections, the front between St. Charles Avenue and Magazine Street, containing 163 acres, the middle between Magazine Street and a railroad right of way, containing 106 acres and the batture, containing 38 acres. The front section of the park contains an 18 hole golf course occupying 76 acres, 30 acres of lagoons, and 57 acres occupied by a shelter house, roadway network, greenhouse, and open space principally on the periphery of the golf course.
The zoo, located in the middle section of the park before the expansion project, contains 14.7 acres. The swimming pool and tennis courts occupied 14.5 acres. The balance of 76.6 acres is open spaces containing playing fields and picnic areas.
In August, 1971 a comprehensive study of the zoo was presented to the Park Commission by the Bureau of Governmental Research, and extensive improvements were recommended. In October, 1972 a contract was entered into between the City of New Orleans and the architectural firm of Cimi-ni & Meric & Associates, Inc. to provide services in connection with the renovation and expansion of the zoo, and in September, 1973 this Master Plan was approved by the City Planning Commission and shortly thereafter the first contracts were entered into.
The scope of the Master Plan, and what had taken place at the time this suit was filed is as follows: The zoo, as of 1971 consisted of 12.7 acres on the western side of the middle park, known as Merz Memorial Zoo, and an additional two acres which housed the sea lions and reptiles, located across and beyond Natatorium Drive, east of the main part of the zoo.
Phase I of the plan which was underway at the time this suit was filed, and which is now complete, consisted of the construction of a new bird house, relocation of the rides, renovation of the entrance and the fencing. The bird house and the entrance renovation are located within the area of the old zoo on the west side of the middle park. There is no serious issue in this case over this aspect of the zoo renovation.
Similarly, the removal of the rides is not an issue since their removal would be consistent with plaintiff’s position, because more open space would result from their removal.
The question with which we are here concerned is whether or not the plaintiff is entitled to have the fences removed as an incident to his overall prayer for injunction against implementation of the Master Plan beyond the original confines of the zoo.
The fences have the effect of closing the south and most of the eastern part of the middle park section. The playing fields on the northwest corner of the middle park section will be taken up by the zoo and the parking area to serve the zoo.
*989 Appellant contends the expansion of the zoo from 12.7 fenced-in acres to 58 fenced-in acres and additional 11 acres of paved parking will destroy the park as a park. In support of this contention they rely principally on the expert testimony of Dean Gerald J. McLindon of the School of Environmental Design at Louisiana State University. Dean McLindon testified at length concerning the evolution of parks from the private preserves of the aristocracy meant for viewing, through the Industrial Revolution to the present time when they are now responsive to the needs of the people and their activities.
According to this witness prior to the erection of the fence, people were able to move about at will, and their free use of the true pastoral area and open spaces is not curtailed. The admission charge will also limit the use of the area to the public.
He further objected to synthetic materials used to simulate geographically the boulders or hills of the country of origin of the animals as foreign to the environment which now exists, and out of place in relation- to the natural environment.
The dean did point out that parks are continuing to evolve in response to the needs of the people and that progressive growth and change will continue. However, he was of the opinion that the fencing of the middle park area and the admission charge were drastic changes that were undesirable.
The evidence does establish that the Master Plan will substantially expand the zoo from its present size; however, the trial court found:
“That area comprehended in the Master Plan for expansion of the Audubon Park Zoo has been used as a Zoo in greater or lesser degrees, for the past 40 years. The testimony adduced at the trial convinces the Court that the Master Plan simply recaptures for general use as a Zoo, areas which previously were used as a Zoo and temporarily abandoned from such use. As far back as 1933 immediately adjacent to Magazine Street were located animal exhibits. In fact all of the land area between Magazine Street and River Road has from time to time and to some extent been used as a Zoo. The present contemplated use of that same area is for use as a Zoo. This does not change the nature and character of use of that portion of the Park.”
These reasons are supported by the testimony of John Northcutt, a retired employee of the Audubon Park Commission who started to work at the park -in 1933. At that time the zoo was located in the area of mid park near Magazine Street between Exposition Boulevard and Walnut Street. It was relocated in 1938 by the WPA.
Mayor Landrieu remembered visiting the park daily as a child, and recalled the sea lions, reptiles and aquarium were located outside of the perimeter of the present zoo. Likewise Attorney General Guste recalled animal cages located in the area between Magazine Street and the Aquarium.
Thus, the trial court concluded that the fences did not have the effect of changing the nature and character of the park, and the expansion simply recaptured areas of the zoo which had previously been used therefor. A careful review of the record amply supports this conclusion.
For the reasons assigned, the judgment appealed from is affirmed.

AFFIRMED.

SCHOTT, J., dissenting with written reasons.

. Such an amendment was filed.